# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | **FILED UNDER SEAL** |
| | : | |
| v. | : | **CRIMINAL COMPLAINT** |
| | : | |
| MATHEW R. SHELDON | : | Mag. No. 11-3042 (PS) |
| | : | |

I, Jeffery R. Clark, being duly sworn, state the following is true and correct to the best of my knowledge and belief. From at least as early as February 2005 through in or about July 2009, in Essex County, in the District of New Jersey and elsewhere, defendant MATHEW R. SHELDON did:

## SEE ATTACHMENT A

I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this complaint is based on the following facts:

## SEE ATTACHMENT B

continued on the attached pages and made a part hereof.

_____
Jeffery R. Clark, Special Agent
Federal Bureau of Investigation

Sworn to before me and subscribed in my presence,
March 16, 2011 in Essex County, New Jersey

HONORABLE PATTY SHWARTZ
UNITED STATES MAGISTRATE JUDGE

_____
Signature of Judicial Officer

## ATTACHMENT A

From at least as early as February 2005 through in or about July 2009, in Essex County, in the District of New Jersey and elsewhere, defendant

## MATHEW R. SHELDON

did knowingly and intentionally conspire and agree with CC-1 and others to devise a scheme and artifice to defraud Law Funder, Individual 2, Individual 3, and Individual 4 of their intangible right to MATHEW SHELDON's honest services in the performance of MATHEW SHELDON's duties, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and, for the purpose of executing such scheme and artifice, to cause to be transmitted by means of wire communications in interstate commerce writings, signs, signals, and pictures, contrary to Title 18, United States Code, Sections 1343 and 1346.

In violation of Title 18, United States Code, Section 1349.

## ATTACHMENT B

I, Jeffery R. Clark, a Special Agent of the Federal Bureau of Investigation, have knowledge of the following facts based upon my investigation and discussions with witnesses and other law enforcement agents. Since this affidavit is submitted for the purpose of establishing probable cause to support the issuance of a complaint and arrest warrant, I have not included each and every fact known by the government concerning this investigation.

## BACKGROUND

1.    At various times relevant to this Complaint:

a.    CC-1, a co-conspirator not charged in this Complaint, resided in New Jersey and was the founder and President of Montclair Funding Group, LLC ("MFG").

b.    Individual-1, a relative of CC-1, was a resident of New Jersey and was responsible for the management and operation of MFG from in or about 2006 through in or about 2007, for which Individual-1 received a salary from MFG.

c.    Law Funder, LLP, was a Delaware corporation with a principal place of business at 295 Madison Avenue, 29th Floor, in New York, New York ("Law Funder"). Law Funder was in the business of advancing money to parties in litigation in return for a stake in the outcome of the litigation. For example, if a plaintiff in a lawsuit stood to win money but needed funds prior to the outcome of the litigation, the plaintiff would approach Law Funder. Law Funder also received indirect inquiries from plaintiffs in litigation presented to Law Funder by third-party brokers.

d.    MFG was a New Jersey corporation with a principal place of business at 1902 Bergenline Avenue, in Union City, New Jersey. MFG was formerly located at 295 Madison Avenue, 27th floor, in New York, New York. MFG's primary business was operating as a broker between plaintiffs seeking advances against potential recoveries in pending litigation from private funding entities such as Law Funder. If a funding entity elected to make an advance to a client presented to it by MFG, the entity would pay to MFG a broker's fee of approximately 20% of the advance amount approved to the plaintiff. MFG received payment of its broker's fee when the funding entity issued an advance to a plaintiff, and regardless of whether the plaintiff ever repaid the advance.

e.    Defendant MATHEW R. SHELDON ("SHELDON") was a resident of New York and the owner of a 25% interest in Law Funder. SHELDON provided services to Law Funder for which SHELDON received a salary that reached approximately $250,000. Among other things, SHELDON's responsibilities at Law Funder included managing staff, acting as legal counsel for Law Funder, interacting with brokers who referred potential clients to Law Funder, and underwriting and performing due diligence on proposed advances to prospective Law Funder clients. Although Law Funder employed underwriters in addition to SHELDON, final authority to approve proposed advances to potential Law Funder clients rested solely with SHELDON.

1

f.      Individual-2 was a resident of New Jersey and a 25% co-owner of Law Funder.

g.      Individual-3 was a resident of New Jersey and a 25% co-owner of Law Funder.

h.      Individual-4 was a resident of New Jersey and a 25% co-owner of Law Funder.

i.      Law Funder, Individual 2, Individual 3, and Individual 4 each had an intangible right to the honest services of SHELDON.  In SHELDON's capacity as an employee of Law Funder and as a business partner in the venture, SHELDON owed Law Funder, Individual 2, Individual 3, and Individual 4 a duty to, among other things, refrain from demanding or accepting any benefit as consideration for a decision to award or approve work relating to a potential Law Funder client to MFG or any other brokerage firm offering to provide services to Law Funder.

The Litigation Funding Process

2.      Generally, private litigation funding institutions, such as Law Funder, operate under one of two primary business models.  The first model is a self-contained, or closed model, in which the funding institution solicits, receives, and disposes of funding requests from potential clients.  In such a closed model, the funding institution maintains an in-house advertising department to generate inquiries from potential clients, an in-house sales department to gather the relevant information and documents in support of funding opportunities, and an in-house underwriting department to scrutinize information and documents concerning potential funding opportunities, evaluate the strengths and risks of the underlying cases, and make a decision concerning how much money to advance to clients.  In such a closed model, there is no need for an outside broker because a broker's primary role is undertaken by the in-house advertising and sales departments.  Consequently, while such closed funding institutions may charge clients a fixed origination or processing fee, clients are not subject to a broker's fee.

3.      The second primary business model for private litigation funding institutions is an inter-dependent, or open model.  Such open model funding institutions avoid the expense associated with maintaining in-house advertising and sales departments by relying on outside brokerage firms to generate inquiries from potential clients and gather the relevant information and documents in support of funding opportunities.  Open model funding institutions generally staff only an underwriting department, which is responsible for scrutinizing information and documents concerning each potential funding opportunity, as provided by brokers, and evaluating the strengths and risks of the underlying cases.  Thereafter, the underwriting department will make a decision concerning how much money to advance to a particular client.  Open model funding institutions compensate brokers by paying them a fee that is typically an amount equal to between approximately 15% and 20% of the amount advanced to the client in a particular transaction.  Open model funding institutions typically pass on to their clients the expense of a broker's fee, either directly, as line items in repayment contracts, or indirectly, in the form of increased interest rates in a repayment contract.

2

The Law Funder Business Model

4.      Law Funder operated under a hybrid business model that most closely resembled an open model, with certain exceptions.  Law Funder did not employ a dedicated advertising or sales staff, and, instead, primarily relied on outside brokers to perform the tasks associated with those departments.  However, in certain instances, Law Funder cultivated funding opportunities internally by accepting direct inquiries from potential clients.  In such instances, Law Funder relied on its internal staff to cultivate a relationship with those potential clients and to collect the information and documents necessary to evaluate the strengths and risks of funding advances to those potential clients.  If Law Funder accepted such a direct-inquiry case for funding, no broker fee would apply to the transaction because it was managed solely by Law Funder staff.

5.      In other instances, rather than handle a direct inquiry internally, Law Funder would send information concerning the inquiry, referred to as a "lead," to one of several outside brokers with which Law Funder worked.  The selected broker would complete the work of developing the lead, collect the required underlying information and documents, and deliver the finished funding opportunity to Law Funder for consideration.  In such instances, if Law Funder decided to fund the opportunity, the managing broker would be paid a broker's fee on the final funding amount.

6.      Law Funder primarily operated under the traditional, open model and accepted potential funding leads from outside brokers.  In such instances, if Law Funder decided to fund a particular lead, the managing broker would be paid a broker's fee on the final funding amount.  Over time, Law Funder moved toward an exclusively open model and referred most direct inquiries to outside brokers.

## THE KICKBACK SCHEME

7.      Between in or about February 2005 through in or about July 2009, SHELDON, CC-1 and their co-conspirators, acting for their own financial gain, designed and executed a kickback scheme involving Law Funder and MFG.  As part of the scheme, SHELDON referred certain direct inquiries from potential clients of Law Funder to CC-1 at MFG.  SHELDON and CC-1 agreed that CC-1, working as part of MFG, would take those direct inquiries and refer them back to Law Funder.  As a direct inquiry to Law Funder, no broker's fee would apply to the transaction, if funded.  However, as part of the scheme, since the inquiry came from MFG, Law Funder was required to pay a broker's fee to MFG.  SHELDON and CC-1 agreed to share the broker's fee on such transactions and to conceal their kickback arrangement from Law Funder, Individual 2, Individual 3, and Individual 4.

8.      In or about February 2005, SHELDON and CC-1 met to discuss the business relationship between MFG and Law Funder.  During that meeting, SHELDON proposed to CC-1 that SHELDON and CC-1 execute an agreement concerning Law Funder's disposition of certain direct inquiries from potential clients seeking advances from Law Funder.

9.      During the meeting, SHELDON proposed to CC-1 that SHELDON would send

3

certain leads from potential clients seeking direct advances from Law Funder to CC-1 for disposition by MFG. In exchange, CC-1 agreed to SHELDON's demand that CC-1 divide equally with SHELDON the broker's fee paid by Law Funder in connection with each advance that resulted from SHELDON's referrals of such leads to CC-1 (the "Kickback Scheme").

10. Also during the meeting, CC-1 agreed to SHELDON's demand that CC-1 conceal the Kickback Scheme from Law Funder, Individual 2, Individual 3, Individual 4, and others.

11. Thereafter, SHELDON and CC-1, in fact, concealed the Kickback Scheme from Law Funder, Individual 2, Individual 3, Individual 4, and others by, among other means, using code words, such as "Giants" or the letter "G", to refer to transactions that were part of the Kickback Scheme in ledgers, spreadsheets, documents, and other records that tracked transactions between Law Funder and MFG.

12. During the period of the conspiracy, SHELDON and CC-1 met in the MFG offices at or around the end of each work week to review ledgers, spreadsheets, documents, and other records that tracked transactions between Law Funder and MFG to identify the coded transactions and calculate the amount payable to SHELDON by CC-1, pursuant to the Kickback Scheme.

13. After SHELDON and CC-1 identified the amount owed to SHELDON each week as a result of the Kickback Scheme, CC-1 would cause periodic electronic or other payments to be made from MFG and other accounts at banks in New Jersey, controlled by CC-1 or Individual 1, to personal accounts at banks outside of New Jersey, controlled by SHELDON.

14. Pursuant to the Kickback Scheme, CC-1 paid to SHELDON a total of approximately $1,000,000, including through the use of wire communications in interstate commerce. Among other things, SHELDON used proceeds from the Kickback Scheme to purchase illegal drugs, engage in illicit gambling, and patronize prostitutes in New York, New Jersey, and elsewhere.

4